In re ALLBORO WATERPROOFING CORP., Debtor.

John S. PEREIRA, Chapter 7 Trustee of Allboro Waterproofing Corp., Plaintiff,

v.

ALLBORO BUILDING MAINTENANCE, INC., Defendant.

John S. PEREIRA, Chapter 7 Trustee of Allboro Waterproofing Corp., Plaintiff,

v.

Dionysios VLACHOS, Defendant.

John S. PEREIRA, Chapter 7 Trustee of Allboro Waterproofing Corp., Plaintiff,

v.

Marianthi VLACHOS, Defendant.

John S. PEREIRA, Chapter 7 Trustee of Allboro Waterproofing Corp., Plaintiff,

v.

Jerry VLACHOS, Defendant.

John S. PEREIRA, Chapter 7 Trustee of Allboro Waterproofing Corp., Plaintiff,

v.

Evy MELACKRINOS, Defendant.

John S. PEREIRA, Chapter 7 Trustee of Allboro Waterproofing Corp., Plaintiff,

v.

Nikitas VLACHOS, Defendant.

John S. PEREIRA, Chapter 7 Trustee of Allboro Waterproofing Corp., Plaintiff,

v.

Constantine VLACHOS, Defendant.

John S. PEREIRA, Chapter 7 Trustee of Allboro Waterproofing Corp., Plaintiff,

v.

ALLCITY CONSTRUCTION, Defendant.

John S. PEREIRA, Chapter 7 Trustee of Allboro Waterproofing Corp., Plaintiff,

v.

ENOS INTRCONTINENTAL, Defendant.

John S. PEREIRA, Chapter 7 Trustee of Allboro Waterproofing Corp., Plaintiff,

v.

Dionysios VLACHOS and Marianthi Vlachos, as Trustee of D. Vlachos Annuity Trust, Defendant.

Dionysios VLACHOS and Marianthi Vlachos, as Trustee of M. Vlachos Annuity Trust, Defendant.

Bankruptcy No. 195–17372–353. Adversary Nos. 197–1615– 353 to 197–1625–353.

United States Bankruptcy Court, E.D. New York.

Aug. 17, 1998.

Gersten, Savage, Kaplowitz, Fredericks, & Curtin, L.L.P. by Harold D. Jones, New York City, for Chapter 7 Trustee.

John S. Pereira, New York City, Chapter 7 Trustee.

Pryor & Mandelup, L.L.P. by Eric J. Snyder, Westbury, NY, for debtor and defendants.

## DECISION ON MOTIONS TO DISQUALIFY COUNSEL

JEROME FELLER, Bankruptcy Judge.

### I. INTRODUCTION

Before the Court are eleven identical motions brought by the Chapter 7 trustee ("Trustee") of Allboro Waterproofing Corp. ("Debtor") to disqualify the law firm of Pryor & Mandelup, LLP ("P & M"), as counsel for the defendants in eleven interrelated adversary proceedings instituted by the Trustee.

Dionysios Vlachos, sole shareholder of the Debtor, is a defendant in one of those lawsuits, an avoidance action that forwards preference, fraudulent conveyance, piercing the corporate veil, and breach of fiduciary duty theories of recovery. The other ten adversary proceedings advance similar claims. Five complaints name members of Dionysios's immediate family as defendants: his wife, Marianthi Vlachos; their children, Jerry Vlachos, Evy Melackrinos, and Constantine Vlachos; and Dionysios's brother, Nikitas Vlachos. Three more are filed against Vlachos family run businesses: Jerry owns Allboro Building Maintenance Inc.; Constantine is president of Enos Intercontinental; and Nikitas is president of Allcity Construction. The two remaining adversary proceedings are brought against Dionysios and Marianthi, in their capacity as trustees of two annuity trusts that designate each individual as beneficiary. The Vlachos family members and related entities, sued by the Trustee in these adversary proceedings, are hereinafter collectively referred to as "Defendants;" individual family members, as indicated, are referred to by first name.

In addition to representing the Defendants in the adversary proceedings, P & M acts as counsel for the Debtor in this bankruptcy case. According to the Trustee, the simultaneous representation of the Debtor and the Defendants creates a conflict of interest which warrants the disqualification of P & M as counsel for the Defendants. Although arguing that there is no actual conflict, P & M has voiced a willingness to

withdraw from representing the Debtor if this Court determines that an impermissible conflict exists, thereby enabling P & M to continue as counsel for the Defendants. We approach this matter mindful of the important competing interests at stake. It is incumbent upon a judicial tribunal to preserve, to the greatest extent possible, both the right to be represented by the counsel of one's choice and the public interest in maintaining the highest standard of professional conduct and the scrupulous administration of justice.

This Court agrees with the Trustee in part. The interests of the Debtor and the Defendants do differ, and there is an actual conflict that merits cessation of the multiple representation. However, rather than adopt the Trustee's solution, we hold that the appropriate remedy in this case is to allow P & M to voluntarily withdraw from representing the Debtor and continue as counsel for the Defendants. Accordingly, for all of the reasons hereinafter set forth, the Trustee's motions are denied. P & M is permitted to remain as counsel for the Defendants, provided that the firm withdraws as counsel for the Debtor.

This opinion constitutes the Court's findings of fact and conclusions of law in accordance with Fed.R.Bankr.P. 7052, made applicable to this contested matter by Fed. R.Bankr.P. 9014.

## II. FACTS

The facts in this matter are largely undisputed. On September 1, 1995, an involuntary petition was filed against the Debtor. No responsive pleading was filed contesting the petition, and an order for relief followed soon after. The Debtor failed to file a list of creditors within fifteen days of the order for relief, as required by Fed.R.Bankr.P. 1007(a)(2), nor did anyone appear on behalf of the Debtor on November 27, 1995, the date set for the first scheduled meeting of creditors, conducted pursuant to 11 U.S.C. § 341(a).

The petitioning creditor, Turner Towers Tenant Corp. ("Turner Towers"), believed that the Debtor's assets had been improperly transferred to prevent collection of an arbitration award decided in favor of Turner Towers. Pursuant to Fed.R.Bankr.P.2004, Turner Towers moved for an examination of the Debtor, Dionysios, Marianthi, Jerry, and Allboro Building Maintenance ("ABM"), a corporation allegedly formed by Jerry, sometime in September 1994, to siphon assets from the Debtor. On December 8, 1995, this Court signed an order granting Turner Towers the requested relief, provided that no party would be required to appear or produce any documents absent a subpoena duly issued and served in accordance with Fed. R.Bankr.P. 9016.

In early 1996, prior to an examination scheduled for January 11, Turner Towers was contacted by P & M, and informed that the firm represented ABM and Jerry, but not the Debtor. In a flurry of letters and telephone conversations with P & M during that month, Turner Towers urged the scheduling of depositions and turnover of requested documents. Those attempts were unsuccessful, however, and Turner Towers moved, on February 1, 1996, for an order directing Jerry and ABM to comply with the Court's order of December 8, 1995 and adjudging them in civil contempt. The motion also sought relief in the form of compelling Dionysios, on behalf of the Debtor, to file required lists, schedules, and statements, and attend a § 341 meeting.

P & M continued to remain active in the bankruptcy case, as the civil contempt battle ensued during the next several months. It filed papers in opposition to the contempt motion on behalf of Jerry and ABM, and appeared at the hearing which was held on the matter. Eventually, the February motion was withdrawn, only to have Turner Towers file a nearly identical contempt motion on April 22, 1996. Ultimately, an order granting the civil contempt motion was signed in late May. Among other provisions, the order required that the Debtor, through Dionysios, comply with the prior Rule 2004 requests made by Turner Towers. However, because of Dionysios's unavailability (he had

retired to Florida with Marianthi), Jerry was designated as the Debtor's "responsible person." The May order was therefore amended, on June 17, 1996, to reflect Jerry's newly appointed duties to provide for the production of the Debtor's corporate records, file the necessary schedules and statements, and appear for the Debtor at the § 341 meeting. Jerry's counsel, P & M, was also retained as counsel for the Debtor at this time, and aided turn over of the required documents and attended the subsequently scheduled § 341 meeting.

The skirmishes fueled by Turner Tower's contempt motions apparently delayed normal progression of the bankruptcy case, and by October 1997 the Trustee's deadline to bring avoidance actions loomed. The Trustee obtained stipulations to extend the time to file complaints, and eventually initiated eleven adversary proceedings against the Defendants on December 30, 1997. At the first scheduled pre-trial hearing, held February 24, 1998, P & M stated that it would thereafter represent all of the Defendants. Less than one month later, on March 17, 1998, P & M filed motions to dismiss the eleven adversary proceedings.

In the instant motions to disqualify, filed May 18, 1998, the Trustee requests that P & M be disqualified from representing the Defendants, arguing that P & M is hopelessly entangled in an obvious conflict of interest through the simultaneous representation of the Debtor and the Defendants. Moreover, P & M must be disqualified in any event, according to the Trustee, due to a likelihood that the Defendants' lead counsel, Eric J. Snyder, Esq. ("Snyder"), will be called by the Trustee as a witness.[1]

P & M, on the other hand, claims that there is no actual conflict because the litigations are in their infancy; the adversary proceedings are still in the early pre-trial stage as responsive pleadings have not as yet been filed, thus rendering any conflict a mere potentiality. Furthermore, according to P &

M, the Trustee has not met the heavy burden required to show a disqualifying conflict and thereby separate clients from their chosen attorney. If, however, the Court determines that an actual conflict exists, P & M offers to withdraw from representing the Debtor and continue in these adversary proceedings as counsel for the Defendants.

P & M also contends that the Trustee does not have standing to bring the motions. This position is predicated on an assertion that the Trustee consented to the representation of the Defendants and the Debtor at the first pre-trial hearing held February 24, 1998. P & M states that it would not have presumed to undertake representation of all of the Defendants absent securing prior consent from the Trustee. Although he admits giving consent, the Trustee maintains that it was extended only within the context of settlement negotiations. Happily, a determination of the actual extent of the Trustee's consent is unnecessary to a resolution of the instant motions.

### III. DISCUSSION

#### A. Conflict of Interest

■ Disqualification is a drastic measure that results in denying a client representation by the attorney of choice. See *Government of India v. Cook Indus., Inc.*, 569 F.2d 737, 739 (2d Cir.1978). The Second Circuit has therefore adopted a cautious approach when resolving disqualification motions, mindful that they may be made simply as " 'tools of the litigation process, being used . . . for purely strategic purposes.' " *Allegaert v. Perot*, 565 F.2d 246, 251 (2d Cir.1977) (alteration in original) (quoting Judge Ellsworth A. Van Graafeiland, *Lawyer's Conflict of Interest—A Judge's View* (Part II), N.Y.L.J., July 20, 1977, at 1, col. 2).

---

1. In his initial papers, the Trustee also argued that disqualification was warranted because a conflict of interest arises through the multiple representation of the eleven Defendants, without regard to P & M's simultaneous representation of

the Debtor in the bankruptcy case. The Trustee later recanted this argument during oral presentations held June 30, 1998, agreeing that one firm could, at this time, adequately represent all of the Defendants.

Seeking to remain as counsel for both the Debtor and the Defendants, P & M asserts that there is no actual conflict of interest and suggests that the Trustee's motions were designed to delay dismissal of the adversary proceedings. Notwithstanding P & M's protestations, it is clear to this Court that allowing the simultaneous representation to continue would result in an ongoing, impermissible conflict of interest. Although attorneys are permitted to simultaneously represent multiple clients, such engagements should be scrutinized carefully.

■ New York's Code of Professional Responsibility ("Code of Professional Responsibility")[2] not only provides guidance to attorneys by promoting a policy of unswerving loyalty to one's client, it also provides guidance to courts when asked to resolve a litigant's request for a lawyer's disqualification.[3] Canon 5, entitled "A Lawyer Should Exercise Independent Professional Judgment on Behalf of a Client," provides that

> [t]he professional judgment of a lawyer should be exercised, within the bounds of the law, solely for the benefit of his client and free of compromising influences and loyalties. Neither his personal interests, the interests of other clients, nor the desires of third persons should be permitted to dilute his loyalty to his client.

New York Code of Professional Responsibility Canon 5. The Code of Professional Responsibility further provides, in its disciplinary rules which describe ethical behavior beneath which no lawyer should fall, that

"[a] lawyer shall not continue multiple employment if the exercise of independent professional judgment in behalf of a client will be or is likely to be adversely affected by the lawyer's representation of another client, or if it would be likely to involve the lawyer in representing differing interests...." *Id.* DR 5–105(B). The Code of Professional Responsibility defines the term "differing interests" broadly, encompassing "every interest that will adversely affect either the judgment or the loyalty of a lawyer to a client, whether it be a conflicting, inconsistent, diverse, or other interest." *Id.* Definitions.

Characterizing P & M's representation of the Defendants, while serving as attorney for the Debtor in the bankruptcy case, as an impermissible multiple representation of the Debtor's principals, officers, directors, and other insiders, the Trustee relies heavily on the reasoning set forth in *Parker v. Frazier (In re Freedom Solar Center, Inc.)*, 776 F.2d 14 (1st Cir.1985). In that case, a lawyer was prohibited from simultaneously representing a corporate Chapter 7 debtor and the debtor's sole shareholder. Initially, the attorney was hired to represent the corporate debtor, and later was also retained by the principal and the principal's newly formed corporation to assist in their efforts to purchase certain assets of the debtor.

Applying Maine's version of DR 5–105, Maine Bar Rule 3.4,[4] the First Circuit identified two adverse interests arising by virtue of the multiple representation:

> First, [the principal's] interest was in delaying the turnover of the assets to use his possession of them as a negotiating chip, while the debtor's interest was in cooperat-

---

**2.** In August, 1969, the American Bar Association promulgated the Model Code of Professional Responsibility, which the New York State Bar Association adopted, with certain amendments, as its own code of ethics, effective January 1, 1970. Effective September 1, 1990, the Appellate Divisions of the New York State Supreme Court promulgated ethical rules patterned on the Disciplinary Rules of the Model Code.

**3.** Federal bankruptcy courts sitting in New York generally apply the Code of Professional Responsibility to ethical disputes, including disqualification motions. *See, e.g., In re Caldor, Inc.,* 193

B.R. 165, 178 (Bankr.S.D.N.Y.1996) ("Courts look to the Code of Professional Responsibility in analyzing conflicts under the Bankruptcy Code."). Indeed, pursuant to local rules, attorneys must read and become familiar with the Code of Professional Responsibility before they may be admitted to practice in local New York federal courts. *See* S.D.N.Y. & E.D.N.Y.L.Civ.R. 1.3(a); E.D.N.Y. LBR 2090–1(a).

**4.** Like New York's Code of Professional Responsibility, the Maine Bar Rules are based upon the Model Code of Professional Responsibility. *See Freedom Solar,* 776 F.2d at 16. Rule 3.4 is nearly identical to New York's DR 5–105.

ing with the trustee to achieve the swiftest resolution possible. Second, [the principal's] interest was in purchasing the assets for the lowest possible price, while the debtor's interest was in selling the assets for the highest possible price.

*Id.* at 16. Moreover, an adverse interest existed, at least potentially, insofar as the trustee was considering the commencement of a preference action against the principal. Noting that a debtor has certain responsibilities arising under 11 U.S.C. § 521, the court observed that a suit against the principal "would create a situation in which the debtor's duty to cooperate and turn over documents might be directly opposed to [the principal's] interest in preventing disclosure." *Id.* at 18.

■ Here, representation of both the Debtor and the Defendants engenders a conflict quite similar to the potential conflict discussed in *Freedom Solar.* P & M must counsel the Debtor to comply with its ongoing duty to "cooperate with the trustee as necessary to enable the trustee to perform the trustee's duties under this title," as well as to "surrender to the trustee all property of the estate and any recorded information, including books, documents, records, and papers, relating to property of the estate." 11 U.S.C. § 521(3)–(4); *see also* 11 U.S.C. § 704(1). The Debtor is therefore under a duty to disclose information that would assist the Trustee in his efforts to recover assets of the estate in the preference and fraudulent conveyance actions. Although there are no allegations that P & M has obstructed the Debtor from complying with the commands of § 521, P & M's undivided allegiance owed to the Defendants *per force* compels an adversarial posture at odds with those statutory duties, hence the conflict of interest.

■ P & M counters by positing that it has obtained the requisite consent of each of the Defendants and the Debtor, pursuant to DR 5–105(C), which would allow continuation of the multiple representations. The Code of Professional Responsibility does permit attorneys to represent multiple clients in certain instances, even when their interests differ somewhat, *see Oneida of Thames Band v. New York,* 757 F.2d 19, 22 (2d Cir.), *cert. denied sub nom. Oneida Indian Nation v. Houdenosaunee,* 474 U.S. 823, 106 S.Ct. 78, 88 L.Ed.2d 64 (1985), and explicitly provides that

a lawyer may represent multiple clients if it is obvious that the lawyer can adequately represent the interest of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of the lawyer's independent professional judgment on behalf of each.

New York Code of Professional Responsibility DR 5–105(C). As evidence of consent, P & M obtained separately signed form letters from each individual Defendant, agreeing to the simultaneous representation of that individual and the remaining Defendants. It is obvious, however, that the consent required by DR 5–105(C), which might permit P & M's simultaneous representation of the Defendants in the adversary proceedings and the Debtor in the underlying bankruptcy case, has not been satisfied here.

First, although Dionysios, in his capacity as president and sole shareholder, consented on behalf of the Debtor to the multiple representations, strangely missing from the letters of all the eleven Defendants is any materially significant mention of P & M's simultaneous representation of the Debtor in the underlying bankruptcy case. Only the possibility of divergent interests among the various Defendants is acknowledged. There is no disclosure whatsoever of the dissonant interests between the Debtor and the Defendants. Accordingly, none of the Defendants effectively consented to P & M's representation of the Debtor. Second, and perhaps more importantly, Dionysios no longer speaks for the Debtor. He has been ousted from his management role, *see Commodity Futures Trading Comm'n v. Weintraub,* 471 U.S. 343, 352–53, 105 S.Ct. 1986, 1993, 85 L.Ed.2d 372 (1985); *In re O.P.M. Leasing Servs., Inc.,* 13 B.R. 64, 67 (S.D.N.Y.1981), leaving the Trustee as the only individual who can effectively

give consent, *see Freedom Solar,* 776 F.2d at 17; *In re Jaeger* 213 B.R. 578, 592 (Bankr. C.D.Cal.1997).

P & M asserts further that in addition to the acquiescence given by each of the Defendants, the Trustee consented to the multiple representations of the Debtor and the Defendants at the initial pre-trial hearing, thereby waiving his right to bring a motion to disqualify. The Trustee, on the other hand, maintains that the assent given was only for the limited purpose of settlement negotiations. Fortunately, ultimate resolution of this factual dispute is unnecessary.

■ It may be that in many, if not most, instances a trustee should not oppose the simultaneous representation of a closely held corporate Chapter 7 debtor and its principals to effect a swift and efficient administration of the estate. Most Chapter 7 cases in which an attorney represents both a corporate debtor and its principals, *sub silentio* or otherwise, do not involve representation of adverse or differing interests. Frequently, " 'in a small, closely held corporation the rights of the individual stockholders who control the corporation and of the corporation are virtually identical and inseparable.' " *Parker v. Frazier (In re Freedom Solar Ctr., Inc.),* 42 B.R. 261, 263 (Bankr.Me.1984), *vacated,* 49 B.R. 996 (D.Me.), *rev'd* 776 F.2d 14 (1st Cir.1985) (quoting *In re Brownstein,* 288 Or. 83, 86–87, 602 P.2d 655, 656 (1979)); *accord In re Francis,* 165 B.R. 929, 932 (Bankr.E.D.Cal.1994) ("[T]he corporation, as distinct from the bankruptcy estate, ... cannot realistically or by any exercise of common sense hold an interest adverse to any interest of [the principal shareholder] individually."). The goal in a Chapter 7 case is simply to liquidate the corporation and maximize the return to the estate, objectives which in and of themselves are not inimical to the interests of insiders.

However, when adverse interests arise similar to those presented in the instant case, a trustee's consent to representation of a conflicting interest by a debtor's counsel is incompatible with the trustee's fiduciary status and obligations to maximize and expeditiously administer the estate, as mandated by 11 U.S.C. § 704. It is therefore unlikely that a trustee even possesses the right, absent court approval, to accede to a request by a debtor's attorney to represent a clearly conflicting interest in the context of an adversary proceeding. Consent in such circumstances may well constitute an invalid waiver of the trustee's statutory obligations. *Cf. Weintraub,* 471 U.S. at 355 n. 7, 105 S.Ct. at 1994 n. 7 ("The propriety of the trustee's waiver of the attorney-client privilege in a particular case can, of course, be challenged in the bankruptcy court on the ground that it violates the trustee's fiduciary duties.").

Moreover, even assuming the Trustee actually consented and was able to give such consent, the conflicting interests arising from the Debtor's duties under § 521(3) and (4) and the obligation to effectively and vigorously represent the Defendants are so intrinsic that P & M cannot be allowed to continue with the simultaneous representation. *See Crown Heights Jewish Comm. Council, Inc. v. Fischer (In re Fischer),* 202 B.R. 341, 352 (E.D.N.Y.1996) (commenting that a "court must satisfy itself that no conflict of interest exists"); *Free–Tan Corp. v. 49–50 Assocs. (In re Liberty Music & Video, Inc.),* 54 B.R. 799, 803 (Bankr.S.D.N.Y.1985) (disqualifying an attorney, who held conflicting personal interest, despite client consent). Consent, by itself, is insufficient to cure P & M's obvious inability to comply with the first requirement of DR 5–105(C); i.e., adequate representation of multiple clients. *See Sapienza v. New York News, Inc.,* 481 F.Supp. 676, 680 (S.D.N.Y.1979) (citing *Rice v. Baron,* 456 F.Supp. 1361, 1376 (S.D.N.Y.1978); *Kelly v. Greason,* 23 N.Y.2d 368, 378, 244 N.E.2d 456, 461–62, 296 N.Y.S.2d 937, 945–46 (1968)). Counsel here *cannot* adequately and vigorously represent the Defendants in these adversary proceedings while simultaneously attempting to provide proper counsel to the Debtor in the underlying bankruptcy case.

### *B. Remedy*

■ Although P & M's involvement with the Debtor and the Defendants has been properly labeled as an actual conflict of inter-

est by the Trustee, his request for disqualification is not an inevitable consequence. Because the Code of Professional Responsibility merely provides guidance for professional conduct, *see Armstrong v. McAlpin*, 625 F.2d 433, 446 n. 26 (2d Cir.1980), *vacated on other grounds*, 449 U.S. 1106, 101 S.Ct. 911, 66 L.Ed.2d 835 (1981), "it is particularly important that the Code of Professional Responsibility not be mechanically applied when disqualification is raised in litigation," *S & S Hotel Ventures Ltd. Partnership v. 777 S.H. Corp.*, 69 N.Y.2d 437, 444, 508 N.E.2d 647, 651, 515 N.Y.S.2d 735, 739 (1987). A court's duty is therefore "discretionary in nature," *Hull v. Celanese Corp.*, 513 F.2d 568, 571 (2d Cir.1975), with disqualification reached only after a "painstaking analysis of the facts." *United States v. Standard Oil Co.*, 136 F.Supp. 345, 367 (S.D.N.Y.1955). Moreover, a heavy burden is placed on the movant to show that disqualification is necessary, *see Evans v. Artek Sys. Corp.*, 715 F.2d 788, 794 (2d Cir.1983), and even when a violation of the Code of Professional Responsibility is discovered, that finding does not "automatically result in disqualification of counsel." *W.T. Grant Co. v. Haines*, 531 F.2d 671, 677 (2d Cir.1976).

In the instant case, the Debtor is a corporation that cannot "speak" for itself, therefore requiring an individual to serve as its representative. However, when Turner Towers sought information from the Debtor, its president and sole shareholder was unavailable; Dionysios had retired to Florida. Thus Jerry, the former managing foreman of the Debtor who resides in the area, was designated as the "responsible person." Concurrent with the naming of Jerry as "responsible person," his counsel, P & M, was also denominated as counsel for the Debtor. Thereafter, P & M represented the Debtor during two § 341 meetings and turned over various documents and records requested by Turner Towers and the Trustee.

In light of the limited nature of P & M's representation of the Debtor, the wisdom of prohibiting P & M from representing the Defendants, in favor of the Debtor, is not altogether obvious. Ironically, far from providing unequivocal support, the Trustee's reliance on *Freedom Solar* undercuts his ultimate objective of severing P & M's relationship with the Defendants. In that case, counsel was not permitted to continue with the multiple representation, and was disqualified from representing the debtor's principal and the principal's new corporation; retentions effectuated subsequent to the bankruptcy filing. *See Freedom Solar*, 42 B.R. at 262. However, the lawyer was permitted to continue with the representation of his first client, the debtor. Here, the first clients to hire P & M were Jerry and ABM, and presumably the clients with a greater interest in retaining P & M's services are Jerry and ABM, and the other Vlachos family members and related entities, rather than the Debtor. *See Chinatown Apartments, Inc. v. New York City Transit Auth.*, 100 Misc.2d 495, 497, 421 N.Y.S.2d 958, 960 (Sup.Ct.1978), *aff'd*, 67 A.D.2d 842, 412 N.Y.S.2d 790 (App.Div.1979) (stating that "the first client's rights to loyalty takes precedence over the second client's individual preference for a particular counsel") (citing *Emle Indus., Inc. v. Patentex, Inc.*, 478 F.2d 562, 571 (2d Cir.1973)).

Moreover, unlike the facts in *Freedom Solar*, which involved counsel that was employed with the broad responsibility of representing a corporation from the inception of a voluntary bankruptcy case, this case was initiated by an involuntary petition. P & M neither represented the Debtor prior to the bankruptcy case, nor was P & M retained to file a corporate Chapter 7 petition and then subsequently represent that corporate debtor. Instead, it would appear that P & M was named as Debtor's counsel only as an expedient solution to Jerry's need to retain advice of counsel in order to fulfill his new role as "responsible person" of the Debtor. *Cf. In re Wingspread Corp.*, 152 B.R. 861, 864 (Bankr.S.D.N.Y.1993) (stating that the Code of Professional Responsibility does not permit a jettison of old clients in favor of new, perhaps more lucrative, ones). The firm's narrow and fortuitous involvement with the Debtor apparently emerged through the mere happenstance of its prior representation of Jerry. Accordingly, it would make more sense to sever the relationship with the Debtor rather than the Defendants to purge

the representation of conflicting interests by P & M.

As previously stated, the moving party bears a heavy burden of showing that disqualification is warranted. *See Evans v. Artek Sys. Corp.*, 715 F.2d at 794; *Emons Indus., Inc. v. Liberty Mut. Ins. Co.*, 747 F.Supp. 1079, 1081 (S.D.N.Y.1990). That burden has not been met by the Trustee. He has neither alleged that P & M engaged in any actual improper conduct in the past, nor has he articulated any negative impact on standards of professional conduct or blotch on the administration of justice that may linger after the conflict is resolved. Although the Trustee has asserted that continuing representation would lead to an appearance of impropriety, "when there is no claim that the trial will be tainted, appearance of impropriety is simply too slender a reed on which to rest a disqualification order except in the rarest cases." *Board of Ed. v. Nyquist*, 590 F.2d 1241, 1247 (2d Cir.1979). The Debtor can easily obtain the services of replacement counsel for its future needs arising within the bankruptcy case with little or no disruption. On the other hand, disqualifying P & M from representing the Defendants would spawn unnecessary delay in the adversary proceedings and an unwarranted imposition of added expense on both the Defendants and the bankruptcy estate. In sum, this Court believes that disqualification is an ill-advised course.

Furthermore, the timing of the motions raises serious doubts concerning the Trustee's motive in seeking P & M's disqualification from representing the Defendants. Approximately two years prior to the disqualification motions, in or around June 1996, P & M assumed the legal representation of the Debtor without objection by the Trustee, even though P & M had been retained by Jerry and ABM about six months earlier. Even at that early juncture, the Trustee was surely aware that Jerry and ABM would likely be named as defendants in any future avoidance actions. The December 8, 1995 order granting an examination pursuant to Fed.R.Bankr.P.2004, which formed the basis for the subsequent civil contempt motions, was requested by Turner Towers because of its belief that the Debtor's assets had been diverted to Jerry and ABM. Not only was the Trustee served with numerous documents related to the contempt motions, even a cursory review of the docket would reveal Jerry and ABM's central role in that dispute. Nonetheless, the Trustee neglected to take any action throughout this period.

By October 1, 1997, when P & M signed the stipulations on behalf of Jerry and ABM to extend the time to bring the avoidance actions, the Trustee was again faced with P & M's simultaneous representation of the Debtor, Jerry, and ABM. But for the next seven months, the Trustee still did nothing. Finally, on May 18, 1998, a scant ten days before the scheduled date for the first adjourned hearings on the motions to dismiss the adversary proceedings, filed by P & M on behalf of the Defendants, the Trustee raised his objection to the simultaneous representation by filing the motions to disqualify P & M. In essence, the delay in raising the disqualification issue, particularly in the context of an imminent adjudication of the Defendants' motions to dismiss, leads this Court to raise a skeptical eyebrow.[5]

A further observation, puzzling indeed, is that the Trustee's consent to P & M's repre-

---

5. On facts comparable to the instant case, courts have barred efforts to disqualify attorneys. *See, e.g., United States v. Newman*, 534 F.Supp. 1113, 1127 (S.D.N.Y.1982), *aff'd*, 722 F.2d 729 (2d Cir.), *cert. denied*, 464 U.S. 863, 104 S.Ct. 193 78 L.Ed.2d 170 (1983) (deciding that two years of delay justified denial of a motion to disqualify made on the eve of trial); *Jackson v. J.C. Penney Co.*, 521 F.Supp. 1032, 1034 (N.D.Ga.1981) (stating that a "motion to disqualify should be made with reasonable promptness after a party discovers the facts which lead to the motion"); *Lewis v. Unigard Mut. Ins. Co.*, 83 A.D.2d 919, 919 442 N.Y.S.2d 522, 523 (App.Div.1981) (finding that disqualification was inappropriate given "the inordinate and inadequately explained delay in moving for disqualification"); *see also AMBAC Indem. Corp. v. Bankers Trust Co.*, 145 Misc.2d 52, 56, 546 N.Y.S.2d 265, 268 (Sup.Ct.1989) (holding that a defense of laches to a disqualification motion requires a showing that the movant is acting in bad faith). *But see Baird v. Hilton Hotel Corp.*, 771 F.Supp. 24, 28 (E.D.N.Y.1991) (noting that "[i]n this circuit, laches is generally not a defense to a motion to disqualify").

sentation of the Defendants, if only for the purpose of negotiating a settlement, was ostensibly an effort to expedite and facilitate resolution of the adversary proceedings, and thereby the overall administration of the Debtor's bankruptcy case. Now, however, the Trustee pursues disqualification despite P & M's offer to withdraw as Debtor's counsel, even though such a withdrawal cures the conflict of interest just as effectively as the disqualification urged by the Trustee. *See Molina v. Mallah Org., Inc.,* 804 F.Supp. 504, 513 (S.D.N.Y.1992); *Chateau De Ville Prods., Inc. v. Tams–Witmark Music Library, Inc.,* 474 F.Supp. 223, 227 (S.D.N.Y. 1979). Without identifying any underlying reason for favoring one curative measure over the other, the Trustee's insistence that disqualification is the preferred solution is incomprehensible.

Speculation that it will be necessary to call Snyder as a witness at trial does not suffice as support for the Trustee's preference for disqualification. The Trustee alleges that by representing the Debtor on behalf of P & M, Snyder has obtained information that would be relevant in the avoidance actions, and prejudicial to the Defendants. In that connection, the Code of Professional Responsibility provides that

> [i]f, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that the lawyer or a lawyer in his or her firm may be called as a witness other than oil behalf of a client, the lawyer may continue the representation until it is apparent that the testimony is or may be prejudicial to the client at which point the lawyer and the firm must withdraw from acting as an advocate before the tribunal.

New York Code of Professional Responsibility DR 5–102(B).

However, disqualification motions based upon DR 5–102(B) place a significant burden upon the movant to demonstrate " 'specifically how and as to what issues in the case the prejudice may occur and that the likelihood of prejudice occurring is substantial.' " *Lamborn v. Dittmer,* 873 F.2d 522, 531 (2d Cir.1989) (quoting *Freeman v. Kulicke & Soffa Indus., Inc.,* 449 F.Supp. 974, 978 (E.D.Pa.1978), *aff'd,* 591 F.2d 1334 (3d Cir.1979)); *cf. In re American Motor Club, Inc.,* 119 B.R. 394, 399–400 (Bankr.E.D.N.Y. 1990) (refusing to woodenly apply the Code of Professional Responsibility's rule requiring vicarious disqualification of the lawyer-witness's firm since it was unlikely the matter would be tried before a jury). In fact, such motions "are subjected to strict scrutiny because of the 'strong potential for abuse' when a lawyer invokes the need to call opposing counsel as a witness and then acts to disqualify him as counsel." *Paramount Communications, Inc. v. Donaghy,* 858 F.Supp. 391, 394 (S.D.N.Y.1994) (citations omitted). Here, without providing any specifics, the Trustee's general statements that Snyder's testimony will be both necessary and prejudicial is insufficient to meet the heavy burden to sustain a motion to disqualify under DR 5–102(B).

### IV. CONCLUSION

To support his disqualification motions, the Trustee has done little more than characterize P & M's retention by multiple clients as giving rise to an unacceptable legal representation of conflicting or adverse interests. In essence, the Trustee has relied upon a mere showing that a conflict exists to justify the disqualification of P & M from further representation of the Defendants. When advised of P & M's offer to withdraw as counsel for the Debtor, the Trustee insisted that P & M may not pick and choose whom it would represent. *See Estates Theatres, Inc. v. Columbia Pictures Indus., Inc.,* 345 F.Supp. 93, 100 (S.D.N.Y.1972). As a general proposition, that point is well taken in a conflict of interest quagmire. However, the Trustee is also constrained from picking and choosing his adversaries' legal representation through the medium of a disqualification motion. Otherwise, the determination of which clients may remain represented by a particular attorney is a hollow exercise, governed only by which party first raises the conflict issue and offers what appears to be an acceptable solution.

Although the conflict here cannot be permitted to continue, no resultant harm has been identified were we to adopt P & M's

withdrawal suggestion. Not only has the Trustee failed to allege, much less demonstrate, that any impropriety will likely result should P & M continue in the representation of the Defendants, this Court cannot discern any significant risk that prejudice to the Debtor would occur should P & M be permitted to withdraw as counsel. Under these circumstances, we find the admonition of one tribunal most instructive:

[J]udges must exercise caution not to paint with a broad brush under the misguided belief that coming down on the side of disqualification raises the standard of legal ethics and the public's respect. The opposite effects are just as likely—encouragement of vexatious tactics and increased cynicism by the public.

*Panduit Corp. v. All States Plastic Mfg. Co.,* 744 F.2d 1564, 1576–77 (Fed.Cir.1984).

Accordingly, for all of the above-stated reasons, the Trustee's motions are denied, provided P & M withdraws as legal counsel for the Debtor.

### SETTLE SEPARATE ORDERS CONSISTENT WITH THIS DECISION IN EACH OF THE ABOVE ADVERSARY PROCEEDINGS